is the founder and president of the Lujan Grisham Foundation,     and he's going to talk a little bit about the Lujan Grisham Foundation. All right, our third case this morning is Ortega v. Grisham, 24-2121. Mr. Rowan? Good morning, Your Honors. May it please the Court, Matthew Rowan. For the plaintiff's appellants, I'm going to endeavor to reserve three minutes for rebuttal. The lesson of the Supreme Court's Second Amendment case law is straightforward. Laws that broadly restrict arms use by the public generally face a daunting burden. According to New Mexico, however, it faces no burden here at all. But the state cannot so easily evade its historical scrutiny because HB 129, its recently enacted seven-day cooling-off period, is not a condition or qualification on the commercial sale of arms, and at the very least, it is a law put to abusive ends because it does not serve, in the language of Bruin Footnote 9, and this Court's Rocky Mountain opinion, to ensure only that those who keep and bear arms in the state are in fact law-abiding responsible persons. And without that get-out-of-history free card, HB 129 is plainly unconstitutional. While historically a handful of jurisdictions in the early 20th century required individuals to wait before they could take possession of a new firearm, while licensing authorities conducted a background check, which at the time took far longer than it does today, it was not until the 1990s that states began forcing people to cool off even after, as is true of the plaintiffs here, they've already passed a background check and therefore demonstrated that they are in fact law-abiding responsible citizens. In Rocky Mountain gun owners, I think we classified the 18- to 21-year-old limit as a condition or qualification or sale. Why is that rule not applicable here? How is it different? Three responses. The first is that the argument there wasn't made that something that just requires you to wait is not a condition. We cited Black's Law Dictionary in our opening brief that says the condition excludes something other than a lapse of time. And we think that makes sense because what Heller was talking about and McDonald and Bruin later and Rahimi, when they're talking about conditions, things that demonstrate that an individual on an individualized basis is someone who is law-abiding and responsible, whereas a waiting period, there's no way to satisfy that on an individualized basis. You just sit there. That same is true for an 18-year-old. So the reason that it is true that in terms of they have to wait, but it's different because if you look at Rahimi, what Rahimi said is that the majority opinion made clear that they weren't casting doubt on legislature's authority to determine that certain subsets of the population should be subject to certain conditions. And there's a fundamental difference between saying that felons or the mentally ill or 18- to 20-year-olds are going to be subject to certain conditions and saying everyone is going to be subject to a restriction on their ability to possess. So I think that's the first answer that I would give. So it's like over-inclusive? Yes. And then the second answer that I'd give is the way this law actually works, if it's a condition on anything, it's a condition on one's ability to take possession. And I'd point the court to Appendix 46 and Appendix 55, which is Mr. Ortega's declaration and the declaration from Mr. Pohl, who was the employee at the FFL that sold him the firearm. And what they declare happened is that Mr. Ortega picked out the handgun that he wanted. He gave it to the clerk. He paid for it, including the sales tax. And at that point, he wanted to take possession of the firearm that he had just almost completed a purchase. And the FFL said, well, I can't let you take possession of it. That's not a condition in qualification of sale qua sale. It's a condition on one's ability to take possession. But doesn't that happen when you're required to wait for the background check to be completed and to some extent to go and obtain a license for certain possessions and perhaps take some training before you can possess? Absolutely. But I think it's important to look, even Rocky Mountain and the footnote discussing what conditions are, it's talking about things that someone can satisfy. And I think that's important because if you look at Bruin footnote 9 when it's talking about permissible conditions on the ability to acquire a concealed carry license, they're talking about things that are individualized that you can demonstrate. But then they go on to explain even those can be put to abusive ends. And I think it's important. The state focuses much on, oh, it's just seven days. That's not that big of a deal. But Bruin didn't say abusive means. It said abusive ends. It said that if a particular kind of background check for a specialized permit costs the state $250 to run and they charge you $250 for it, plaintiffs can have a really hard time winning a second amendment challenge. Now, if the state charges $250 for the regular permit that costs them $10 to run, it's the same how, but the why is different. That's what abusive ends mean. And it's the same for a waiting period. And it's also why, at the end of the day, whether this court wants to say that this is a condition on sale or not, I mean, I think the sort of more doctrinally straightforward way to analyze this is this is a law put to abusive ends for two reasons. Well, counsel, could I just, maybe you were referring to this in your previous comments, but let me ask you directly. What do you think Bruin meant in footnote 9 when it referred to, and this is the phrase, lengthy wait times in processing license applications? What do you think it was getting at there? So I think what it was getting at was wait times that are not tied to the time it takes to run a background check. And I think that's why it said abusive ends and not abusive means. Because the wait time itself, if it goes to how long it takes to run the background check, now if it takes five years, there's going to be problems. But it's talking about abusive ends, not the means. The means are how long it takes. That's the how. And so what it's talking about, and I think it's important that Justice Thomas' opinion focuses on the analog to First Amendment jurisprudence. And if you think about First Amendment licensing laws, if in the First Amendment context the state just doesn't set up its system so that it can give parades, it says, oh, yeah, we have a spreadsheet, but we haven't updated it in 10 years. The fact that they have a parade permitting system is not abusive. The fact that they have essentially allowed it to flounder, that's what makes it abusive. And I do think that Rocky Mountain is entirely consistent with this. So at page 122 of this Court's opinion in Rocky Mountain, it says, quote, the permissibility of these conditions or qualifications on concealed carry derives from the fact that they, one, are designed to ensure only that those bearing arms in the jurisdiction are, in fact, law-abiding responsible citizens, which is not true here. And I'll get back to why. And two, they contain only narrow, objective, and definite standards guiding licensing officials. And neither one of those things is true here. So I think it's important to note that after you go in and you either pay for it or you're deterred from paying for the handgun that you want, nothing happens. There is no independent investigation. The state does nothing. Someone could have any manner of misfortune befall them in the seven-day period that could cause them to suffer acute mental distress, and none of that would get captured. This is not a law. You know, the state says in their briefs that, oh, well, no, this law serves to ensure that only people are law-abiding. And respectfully, you don't have to take the state's word for it. I mean, even in something like intermediate scrutiny, you do a fit between, you know, does this law actually serve the ends? And I think that is, Judge Matheson, exactly what Justice Thomas was getting at in footnote 9. And this court said in Rocky Mountain that the 18- to 20-year-old restriction does serve that end. It cited historical sources. It cited scientific sources. Would a three-day waiting period satisfy Bruin here? You know, not seven, but three days? Respectfully, no. And I think, again, that goes to you. So no waiting period. Would it be acceptable under your theory? So I think a waiting period that is entirely untethered to individualized concerns and that elevates the possibility that there will be some non-law-abiding people turns the Second Amendment on its head. I mean, Heller itself made very clear that the enshrinement of the right in the Constitution elevates the rights of the law-abiding above the non-law-abiding. And I think it's important to hear that we're only talking about people who have passed a background check. Could I just, on individualized concerns, where are the individualized concerns on the age restriction? So what Rahimi said is essentially legislatures are allowed to determine that certain groups, that if you're a member of that group, that that's allowed to be a heuristic for individualized concerns. But that's different from arms use by the public generally, which Rahimi in the two sentences later made clear is something that legislatures cannot do. They cannot broadly restrict arms use by the public generally. So look, we think Rocky Mountain is wrongly decided. I understand that. But we're bound by it. I understand. But that's why, if you look at what Rahimi says, it sets up a dichotomy. It says laws that broadly restrict arms use by the public generally are inconsistent with this nation's historical tradition. But wasn't Rahimi an historical tradition case, not a step one case? Yes, although I think the way this Court in Rocky Mountain did the abusive ends analysis, it looked to history. It also looked to whether this actually serves to ensure only that those bearing arms in the State are, in fact, law-abiding responsible. And this law does not serve that end. OK, that actually prompts another thing I wanted to ask you. Tell me if I'm reading it wrong. But it seemed to me that Rocky Mountain said that the Heller presumptively constitutional conditions and qualifications are part of Bruin's step one. Yes, so Rocky Mountain says that. And then it says the way that. And we're bound by that. Yes, of course. But then it builds in this abusive ends discussion. And the concurrence thinks that that should flip over to step two. But the majority didn't. Yes, so in full candor, and this shouldn't come as a surprise, we think Rocky Mountain is wrong. We also think it's methodologically unsound. So we think the presumptively lawful dicta has been jettisoned.  So I think the concurrence has it, I think, somewhat better. Because there's always a presumption of lawfulness. The plaintiff is coming in and challenging a statute on constitutional grounds. It's always presumptively lawful. It doesn't matter if it's a Second Amendment or anything else. So to graft it onto the first step, I don't think it makes a ton of sense. So if this court thinks that the better course of valor is to call for en banc, or if you think you're bound to write an opinion that makes clear to the Supreme Court that the train's left the station. But I think in this case, you can stay squarely within the four corners of Rocky Mountain and recognize that this is a law that broadly restricts arms use by the public generally. It imposes no mechanisms to ensure that someone is not and is law-abiding or not. And I think the state makes this broad point about, oh, well, this is a facial challenge. And therefore, we have to show that individuals who haven't passed a background check come in. And respectfully, that's just not true. If you look at paragraph 28 of our complaint, we ask that it be struck down on its face and as applied. If you look at the end of our preliminary injunction brief, we make the point that this seven-day waiting period has no applicability to someone who hasn't passed a background check. Well, can I just jump in? Because I wanted to ask you about this point, too. Because you also say in your reply brief that you're only challenging this with respect to its application to those who have passed a background check. Correct. I've got that right. Yes. But that's still a facial challenge in a sense, right?  So I think that's right. And I think the Chief Justice in Dovey-Reed makes the point that the nomenclature of facial and as applied can sometimes mean different things. And so it's a facial challenge with respect to people who have passed a background check. So the Chief Justice, in that opinion, cites, too, a Dick Fallon article saying it's a limited-purpose facial challenge. But however you want to call it, this is a very different type of facial challenge, if you think it's a facial challenge, from Rahimi. Because there, he was someone who had been adjudicated dangerous, whereas the plaintiffs here, Ms. Scott and Mr. Ortega, have been they've passed a background check. So in other words, if there is a reverse, goes back, in fashioning the preliminary injunction, it would be to that category. Yes. Those who have passed a background check.  So all we have asked this court to hold is that we are likely to succeed on our own, and that the other preliminary injunction factors are satisfied, but that we're likely to succeed, that as applied to those who have passed a background check, this cooling off period is unconstitutional. Could I just ask you, you mentioned early on in response, or maybe the question was put this way, but that this is overbroad. The waiting period is overbroad. Wasn't the age restriction overbroad as well? So it's not just that it's overbroad. The problem is, it applies to everyone. And that is a horse of a different constitutional code. Well, doesn't, I mean, the age restriction applies to everyone. It applies to everyone in a group. And I mean, I'd ask the court to look to. And this one applies to everyone who haven't. Who wants to exercise a fundamental constitutional right. But who passed a background check, which shrinks the size of the target population significantly. Well, that can't make it better that if you're going to fashion it. I mean, is there anything in the record that tells us? I mean, there was an evidentiary hearing, right? There's all this talk of groups and overbroad and everything else, but do we have any numbers from the record? So, I mean, I just want to make sure that I'm sort of focusing my answer, because the overbreath is not the problem. The problem is that the trigger for this cooling off period is the stated and desired and expressed intent to exercise a fundamental constitutional right. And Rahimi makes very clear. It's the same paragraph. It says, while we do not cast doubt on the ability of states to pass laws that determine certain groups to be allowed to have conditions imposed on their ability to keep and bear arms, laws that restrict arms use by the public generally are horses of a different color. And I see I'm... I think I'll give you some rebuttal, but go ahead and finish your point, and then... And, I mean, I think that's why this is a law put to abusive ends, and it's also why this law is inconsistent with historical tradition, which we can talk about more on rebuttal. Thank you. All right, let's hear from New Mexico. I will give you some rebuttal. Thank you. May it please the Court. Kyle Duffy on behalf of APELIS. Plaintiffs act as if the state of New Mexico is attempting to ban the sale of all firearms ever. But nothing could be further from the truth. Rather, the state is imposing a brief waiting period on the subset of the population who are not federally licensed firearm dealers, law enforcement, or concealed carry permit holders in order to help ensure that they are not subject or, in fact, law-abiding responsible citizens. Plaintiff's request for a facial, disfavored preliminary injunction fails for three reasons. First, plaintiffs fail to show that the plain text of the Second Amendment extends to purchasing or acquiring firearms, and they cannot show that a brief seven-day waiting period that is objectively applied rises to the level of a meaningful constraint or de facto prohibition on their right to keep or bear arms. Likewise, the waiting period is a presumptively constitutional commercial regulation, just like the law at issue in Rocky Mountain Gun Owners, and plaintiffs cannot show that it is abusive given its objective nature and the substantial evidence in the record demonstrating its benefits. But even if plaintiffs could meet their burden under Bruin Step 1, they would lose under Bruin Step 2 because the waiting period is consistent with the principles underpinning our nation's history and tradition of firearm regulation, as demonstrated by intoxication laws, licensing regimes, and group-based sales restrictions. Now, first turning to Bruin Step 1, to the plain text, several circuits have already observed that the Second Amendment's plain text says nothing about purchase or acquisition, and that is the only thing that is regulated here under the waiting period. No, no, go ahead. It really seems illogical that the right, the self-defense right, can be the possession of a defensive weapon. The access to that possession could be impeded. It has to be a burden on the right, doesn't it? You're not arguing that there's no burden here. Well, we're arguing that it doesn't rise to the level of a meaningful constraint on what is textually protected, the right to keep or bear arms. And this is in line with the analysis that the Fifth Circuit applied in McRory and the Ninth Circuit and B&L. There they held that, of course, even though this is not textually protected, people, as a general matter, yes, they need to have some way to buy weapons. So at the same time, they recognized that Bruin said that these regulations on purchasing presumptively are constitutional and therefore presumptively do not impact the plain text. So in wrestling with that, that's how they came upon this meaningful constraint. Is that a line-drawing exercise? In other words, seven days is not a meaningful restraint, but, you know, 10, 14, 20, three months. I mean, is that where the court, where we're stuck, is, like, evaluating at some temporal limit to a waiting period? I do think it depends on the facts of each case, exactly what the restriction is, the evidence supporting the restriction. I think this court could issue a ruling similar to the Fifth Circuit's in McRory where they say there may come a time when this becomes so lengthy as to become abusive, but 10 days is not it. Here we're at seven days. So I don't think this court needs to broadly say, okay, here's the cutoff. The court can just narrowly rule here. Would we tolerate a global ban on the exercise of other constitutional rights? Is there something about the Second Amendment that's different than the First Amendment? Let's say, like, you can't buy ink for seven days or you can't post a social media argument for seven days because you might be impulsive, and that seems pretty obvious. So what makes this right different? First point is that this is not a global ban. People can avoid the waiting period entirely by going through the shall-issue licensing process. But this is also not anomalous to Second Amendment cases. As Chief Judge Thomas in the Ninth Circuit and Sylvester B. Harris observed, we also have waiting periods for the exercise of other fundamental rights, like obtaining a marriage license or organizing a protest or parade. So just by allowing a brief waiting period here does not render the Second Amendment necessarily a second-class right. Going back to the plain text here, Heller made this clear in its detailed textual analysis and the founding-era dictionaries that it cited, that the right to keep is defined as most relevantly to retain, not to lose. And this makes sense given the founders' concerns about their arms being taken away. But, of course, as we recognized, you have to have some way to protect the right to purchase in order to effectuate your right to keep or bear arms. But plaintiffs here cannot show that a short seven-day waiting period rises to the level of a meaningful constraint on the right to bear arms. Is that the same as the abusive ends notion? It does seem very similar. There's a lot of overlap, I would say, between the two. But the way the district court here analyzed the two issues, which was before Rocky Mountain Gun Owners was issued, he had a separate analysis for the plain text and then a separate analysis for the commercial regulations, and then he looked at the abusive ends there. What do you think Rocky Mountain tells us in answer to that question? Not so much the district court, but Rocky Mountain. Rocky Mountain offers a clearer path, I think, through the abusive ends analysis, especially since it is, as you recognize, binding on this panel. Who has the burden on showing abusive ends or the lack of abusive ends? Given that it's plaintiff's burden under Bruin Step 1, it should be plaintiff's burden to show this because we are at Step 1 of the Bruin analysis. What about the reference in Heller to longstanding commercial restrictions? These waiting periods are not necessarily longstanding, are they? Yes, so this was something that was argued before the district court. However, the waiting periods here are as longstanding as felon dispossession laws or other laws that came about for the first time in the 20th century, as Judge Timkovich, as you observed in your concurrence back in United States v. McCain. The fact that our waiting period serves an additional purpose, it serves dual purposes. One is to make sure there's adequate time to perform a background check. Second is also to provide this cooling off period. So plaintiffs claim that these previous waiting periods back in the day, they're not analogous because they only served one purpose, supposedly, which was to allow for the background check. But that's akin to requiring a dead ringer, which was an argument that was emphatically rejected in Rahimi. Regardless, the majority in Rocky Mountain gun owners, they did away with that. The concurrence would have wanted the challenger or the government to prove that was longstanding, but the majority said that it's unclear what was meant between longstanding versus consistent with history and tradition. Well, you don't need a dead ringer, but you need a ringer. What's your best ringer here? Well, I mean, I would say, so we pointed to two categories of laws below broadly, intoxication laws and licensing regimes. And I think taken together, those are our best cases. They stand for the principle that the government may impose a brief delay on someone's ability to keep or use a firearm in order to help ensure that it was not misused. Yeah, but the plaintiff's rebuttal is that that guarantees or facilitates to ensure that law-abiding citizens are obtaining the gun. Just react and rebut that argument for me. So that argument, it rests on a fundamentally flawed and false premise, that background checks are a perfect means of determining whether someone is, in fact, a law-abiding responsible citizen. Background checks look at past behavior. Waiting periods are looking at future behavior. The simple and sad fact is somebody can go into a gun store, pass a background check in a matter of 20 minutes, take that gun out and shoot themselves or shoot somebody else. That's what happened exactly in Uvalde, Texas, and that's what the waiting period is designed to avoid. So you can't just say that this doesn't have any impact. In fact, we submitted significant evidence in the record, declarations, peer-reviewed studies showing that these waiting periods do have a substantial impact upon lessening impulsive gun suicide and homicide. I was interested in that point. Where does that evidence that's in the record fit in the analytical framework that we're working with here? We've got Heller and we've got Bruin and we've got Rocky Mountain and then you've got this evidence. Where does the evidence fit? So taking our lead from Rocky Mountain gun owners, which wrestled with this issue, they admitted that this evidence is – they were a little uneasy with considering it, given Bruin's discouraging of the means and – or, I mean, overruling of the means and analysis. But they said, nonetheless, the Supreme Court said that these laws are presumptively lawful unless you can show that it's abusive. And it's hard to determine if a law is truly abusive as opposed to legitimate without at least somewhat considering the evidence supporting why the law does, in fact, help with preventing law – or with ensuring that law-abiding, responsible citizens have weapons. So that's where this fits. It also fits at the preliminary injunction stage under the balance of the equities and the public interest. Since Bruin wasn't dealing with the preliminary injunction there, it was not saying that you could not consider this when deciding these equitable cases. Plaintiffs, they claim that they can overcome this presumption of constitutionality by showing that it's abusive because they say it applies broadly. But the same could be said of the shall-issue licensing regimes that were approved of at Bruin, which require fees, background checks, fingerprints, universally, regardless of individual circumstances. So we know that can't be. They also claim that it's abusive to the extent that it applies after a background check comes back. But, as I said, background checks are not perfect. What would you say is the scope of coverage, though, of this waiting period in New Mexico? How many New Mexico persons does it cover? Several hundred thousand? I don't believe we have anything in the record that was not fleshed out below. But there are several fairly big categories of people who are exempted, which are federally licensed firearm dealers, law enforcement, and the biggest bucket of people are those who have concealed carry permits. And I'm not exactly sure how many there are. I'm happy to find that out, but it was not in the record below. But that's something anybody can go out and apply for. You take a firearm safety course, you pay a minimal fee, submit for a background check, and then you don't have to wait at all. Why wouldn't those exceptions be equally conducive to impulsive or suicidal? Could you say that again? The exceptions you just mentioned, that class of gun owner is equally susceptible under New Mexico's theory as anybody else to impulsive criminal activity or suicidal. Well, so for federally licensed firearm dealers, they have to go through that check with the ATF. So there is some background check process there. Same with concealed carry permit holders. They have to go through the process of going through this gun safety course, getting a background check. So there's nothing as impulsive about planning all of this out, getting your license. And then law enforcement officers already have access to firearms or trained in that. They also have background checks presumably run on them. Now, I want to address plaintiff's argument that Rocky Mountain Gun Owners does not control because nobody made the specific argument that a law requiring someone to wait is not a true condition or qualification. This is incorrect. I listened to the oral argument there, and they made that exact argument. But even if they didn't, this court said in United States v. Baker, 49 F. 4th at 1348, that a prior panel's holding, quote, is the law of the circuit regardless of what might have happened had other arguments been made to the panel that decided the issue first, unquote. So Rocky Mountain squarely controls here. Well, could I ask a Rocky Mountain question? At one point, that panel said the necessity of some minimum age requirement is widely accepted. And I guess every state has some minimum requirement, right? 18, 21, whatever it happens to be. Is the necessity of a waiting period equally widely accepted? So as of today, I believe there's 13 other states in the District of Columbia which have a waiting period, which is similar, although not as much, to the laws identified in Rocky Mountain. They said there was about 20 other states, I believe, that had set it at 21. So we are in that space. Don't all states have some age limit? Yes, yes, they do. But I would also note that that seemed more of a gilding of the lily for their analysis there. If the analysis depends on whether enough states have passed this law, then no state could pass a new law because they would be the first state in that. I think that was more just to emphasize that this law in Rocky Mountain gun owners was not abusive and had a legitimate purpose. One final note on the facial challenge. Plaintiffs below in their motion for a preliminary injunction requested an unqualified preliminary injunction. And when this was pointed out in our response below, they doubled down at page 524 of the appendix in their reply brief. They cannot now narrow their request for the first time on appeal in their reply brief in a footnote. But regardless of whatever standard this Court applies, the result is the same. The waiting period is constitutional. But they would still have their as-applied challenge anyway, wouldn't they? I don't believe they preserved that. They would have it for later on, but at this juncture. Mr. Ortega, Ms. Scott, I mean, the name plaintiffs? They would as applied to their circumstances, perhaps, but they did not develop this. I see I'm out of time. Can I ask one more question? So could you clarify for me, at your initial presentation, you referred to group-based analogs. Are you still relying on those, specifically the ban on Native American ownership? Are you relying on those analogs that the district court plainly relied on? So we believe those are also sufficient to uphold this law under Bruin's Step 2. They're more of a subcategory of the licensing laws. These were mentioned in Professor Spitzer's declaration. Also, all but two or three of those laws were contained either in his declaration or in secondary sources or case law cited by the parties. And while they are indeed odious and racist and have no place in today's society as a district court, observed rejecting them on this basis would result in an inversion of the Bruin analysis. History is complex. It's messy. But we do have to undertake this historical analysis that Bruin commands. Okay. So the answer to my question is, yes, you are relying on the odious classification. Yes, in addition to the laws that we cited, which we feel are better comparators.  Thank you. Thank you, counsel. Thank you. Appreciate the argument. Could you give Mr. Rohn three minutes, please? I appreciate that. Just a few quick points. So, first, the state acts as if the how is all that matters. But Bruin and Rahimi could not be clear that you have to look at both the how and the why and that they have to match up. That's what abusive ends means. And when the state cited the two purposes that this law serves, it notably did not say that this law serves only to ensure that the only people who are keeping and bearing arms in the jurisdiction are, in fact, law-abiding responsible citizens, which Bruin Footnote 9, Rahimi, and Rocky Mountain all make clear is what distinguishes a condition from an abusive one that shifts the burden to historical tradition. And on historical tradition, respectfully, I don't think this is a close case. So they cite three categories of laws. Again, licensing laws, again, they completely ignore the why. The purpose of a licensing law is to distinguish the law-abiding from the non-law-abiding. That is a permissible purpose. But as they've made clear, this law applies after someone has demonstrated their law-abiding character. The only reason that they apply this law is because, as they said, well, background checks aren't perfect. And, of course, that's true, but nothing is perfect. And if that were enough, then Heller would have come out the other way, because, of course, criminals use handguns. Then Bruin would have come out the other way, of course, because people misuse firearms when they carry. The fact that prophylaxis level 1 and prophylaxis level 2 are insufficient to make sure that there are no crimes cannot justify the imposition of a blunderbuss restriction on the constitutional rights of the law-abiding. With respect to intoxication laws, those are fundamentally individualized. An individual proves themselves to be temporarily irresponsible and can, therefore, on an individualized basis, be temporarily disarmed. And without those two, all they have are, you know, a handful of licensing laws from or waiting period laws from the early 20th century. I think it's, again, important that they use the phrase waiting period without ever acknowledging that this is a cooling-off law. Waiting period laws, historically, were tied to the time it took to determine whether an individual was, in fact, a law-abiding responsible citizen. Is the fact that these waiting periods came around the early, you know, 1920s, does it automatically flunk the longstanding analysis? So I have two different answers to that, and I'll try to do it in the time I have. So the first is, under Rocky Mountain, I don't think that matters. Rocky Mountain seems pretty clearly to reject that longstanding has any role in this analysis. I think that's a little bit incoherent. If you look at the rest of Rocky Mountain, it seems to recognize that longstanding was a, you know, modifier that applied to each of the categories at pages 627 of Heller. But even putting that aside, I don't think that's the quite right way to think about the analysis. I mean, I think what Rahimi makes clear and Bruin, too, is when you have circumstances that would have been unimaginable at the founding, which certainly the ability to instantly run a background check using computers today is, that's when you apply analogical reasoning. And in looking at analogical reasoning, you look at how and why the law burdens the right to self-defense. And the reason that this law burdens the right to self-defense is not in order to determine that someone is, in fact, law-abiding. It's because, as the state themselves admit, their other prophylaxis isn't perfect. But if the enshrinement of a constitutional right means anything, I guess it means two things. One, you can't just say that, well, there are other things we could do, but we're just going to say that everybody who wants to exercise this right, we don't know who it is, but we're just going to make all of you frustrate your exercise. You can't do that. And the second thing is, you can't rely on these sort of odious laws. And while I'm tempted to say, at some level, the less said about those laws, the better, I actually think there's an instructive point here to Judge Matheson's question that you and I were having earlier. At least those are subsets of the population that the legislature determined are not responsible. This is everyone. And the one thing Rahimi makes crystal clear is that that is a horse of a constitutionally different color. And again, this is a law put to abusive ends. It is fundamentally inconsistent with historical tradition to simply say everyone has to cool off just because they want to exercise a fundamental constitutional right. Thank you.  Thank you. We appreciate the arguments and very excellent briefing. Counsel is excused and the case shall be submitted.